| | |
|---|---|
| TRACEY I. CRIDER<br>1233 Salem Ave.<br>Hagerstown, MD 21740, individually and on<br>behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>CONTINENTAL FINANCE COMPANY,<br>LLC<br>4550 New Linden Hill Road, Suite 400<br>Wilmington, DE 19808<br>Serve on:<br>Lamiaa E. Elfar<br>4550 New Linden Hill Road, Suite 400<br>Wilmington, DE 19808<br><br>CONTINENTAL PURCHASING, LLC<br>4550 New Linden Hill Road, Suite 400<br>Wilmington, DE 19808<br>Serve on:<br>Continental Finance Company, LLC<br>4550 New Linden Hill Road, 4th Floor<br>Wilmington, DE 19808<br><br>and<br><br>CKS PRIME INVESTMENTS, LLC<br>505 Independence Parkway, Suite 300<br>Chesapeake VA 23320<br>**Serve on:**<br>The Corporation Trust, Incorporated<br>2405 York Road, Suite 201<br>Lutherville Timonium, MD 21093-2264<br><br>      Defendants. | IN THE CIRCUIT COURT FOR<br><br>MONTGOMERY COUNTY<br><br><br><br><br><br>Case No. _____<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1.     Plaintiff, Tracey I. Crider, brings this action to challenge abusive and unlawful high-interest consumer loan origination and collection practices which Defendants perpetrated against her and similarly situated consumers as described below.

**<u>Introduction</u>**

2.      The affiliated Defendants Continental Finance Company, LLC ("CFC") and its wholly owned subsidiary Continental Purchasing, LLC ("CP") (CFC and CP are collectively, "Continental") are predatory high-interest small-loan broker/lenders.

3.      Continental unilaterally chose, in writing, Missouri law to govern its relationship with Plaintiff and other consumers, but Continental has consistently and continually violated the Missouri laws it elected.

4.      As described in this Complaint, Continental obtained credit card accounts for Plaintiff and each Class member from a third-party bank partner of Continental. Continental advertised and marketed the accounts, took borrower applications and underwrote the loans, and told its bank partner when to issue the credit cards and to whom. Under Continental's pre-arrangement with the bank, Continental and the bank had already agreed that Continental would purchase the right to collect all payments made by Plaintiff and other consumers on the accounts.

5.      But Continental has no license to broker or lend money to anyone, anywhere. The Missouri laws Continental chose to govern its agreements with Plaintiff require loan brokers – which are "credit service organizations" under Missouri law – to include numerous disclosures and cancellation options in their agreements and requires registration as a loan broker. Continental is not registered as a loan broker and included none of the disclosures or cancellation options required by Missouri law.

6.      Nevertheless, Continental has routinely brokered and made credit card loans to consumers, including Plaintiff and many others, under the auspices of Missouri law.

7.      As a result, Plaintiff and other similarly situated consumers are entitled to recover all payments they made to Continental, under the Missouri Credit Service Organizations Law ("MCSOL"), Mo. Ann. Stat. § 407.635 *et seq.*

8.      In addition, Continental's unlicensed brokering/lending practices violate the Maryland Credit Services Businesses Act ("MCSBA"), Md. Code Ann., Com. Law §§ 14-1901 *et seq.* and the Maryland Consumer Loan Law ("MCLL"), Md. Code Ann., Com. Law, which apply regardless of any choice-of-law clauses. As a result of Continental's violations of the MCSBA and MCLL, the loans made to Plaintiff and many others are void *ab initio* and unenforceable. Nevertheless, Continental sold the void and unenforceable loan accounts of Plaintiff and others to a debt-buyer debt collector, Defendant CKS Prime Investments, LLC ("CKS").

9.      CKS bought the void and unenforceable accounts of Plaintiff and others for pennies on the dollar of what Continental claimed was owed, and now CKS is attempting to collect the void and unenforceable loans in full. For example, CKS has sued Plaintiff in Maryland state District Court to collect thousands of dollars on her void and unenforceable account. Plaintiff and other Marylanders in the same situation are entitled to declaratory relief that CKS may collect nothing from them on the void and unenforceable accounts Continental sold to CKS.[1]

---

[1]      Plaintiff's claims against Continental directly under the MCSBA and MCLL statutes are being pursued in *Johnson v. Continental Finance Company, LLC, et al.*, Case No. 8:22-cv-02001-PX (D.Md.), a case in which Ms. Crider is a putative class member. To avoid unnecessary duplication, those already-pending MCSBA and MCLL claims against Continental are not asserted in this lawsuit.

10.    Accordingly, Plaintiff requests certification of an "MCSOL Class" defined as follows:

> All persons within the United States who Continental assisted to obtain a consumer credit card account, where the credit card account agreement elects Missouri law to govern the loan agreement and Continental collected payments under the loan agreement.

> Excluded from the Class are all persons whose claims are barred by the applicable statute of limitations, all employees or representatives of Defendants, and all Court personnel.

11.    Second, Plaintiff requests certification of a "CKS Class" defined as follows:

> All Maryland residents who obtained loans in the amount of $25,000 or less, where the loan application originated in Maryland and where Continental received, through agreements with a third-party financial institution, the exclusive right to collect all payments of principal, interest and fees on the loan, and where the loan was assigned to CKS.

> Excluded from the CKS Class and Subclass are all persons whose claims are barred by the applicable statute of limitations, all employees or representatives of Defendants, and all Court personnel.

## **Parties**

12.    The consumer Plaintiff is a natural person who is a resident and citizen of the State of Maryland, and who was a resident of the State of Maryland and within the state of Maryland at the time she entered into any agreement with Continental. Plaintiff's loan application with Continental originated in Maryland and Continental received, through agreements with a third-party financial institution, the exclusive right to collect all payments of principal, interest and fees on her loan.

13.    The Continental entities are privately-held subprime credit card loan originators, marketers, and servicers. CFC is the sole owner of CP. CFC and CP are each limited liability companies organized in Delaware, with their principal places of business in Delaware.

4

Continental markets, underwrites, services, and collects credit card accounts in Maryland and elsewhere in the United States.

14.     CKS is a debt buyer who is also a debt collector. CKS' principal business is to acquire defaulted consumer debt solely for collection purposes, and to then collect that debt. CKS is a limited liability company organized in Delaware, with its principal place of business in Virginia. CKS, a consumer debt buyer, is part of the consumer lending industry, and it regularly is engaged in the business of acquiring and investing in consumer loan accounts with Maryland residents. Indeed, within the last year, CKS has filed no fewer than 300 lawsuits against Maryland residents seeking to collect money on defaulted consumer loan accounts which CKS acquired and invested in. CKS' business of acquiring and investing in consumer loans, and extending credit to Maryland consumers, is not an ancillary function of CKS but is its primary business purpose.

## Jurisdiction and Venue

15.     This Court has subject-matter jurisdiction over this case pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 1-501 and 4-402(e)(2).  This Court has personal jurisdiction pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 6-102 and 6-103(b), as Defendants transact business and perform work and services in the State of Maryland, contract to supply services in the State of Maryland, and regularly do and solicit business and engage in other persistent courses of conduct in the State of Maryland, including the business described in this Complaint.

16.     Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. §§ 4-402(e)(2) and 6-201, as the amount in controversy in this case exceeds $15,000.00 and because Defendants engage in a regular business and habitually engage in vocation in Montgomery County, Maryland. Among other things, Defendants direct their activity described in this

Complaint to persons including residents of Montgomery County, Maryland, and contract to perform that business with respect to property located in Montgomery County, Maryland. Among other things, Defendants or their assignees or assignors market credit cards to residents of Montgomery County, obtain extensions of credit for Montgomery County residents, collect payments from Montgomery County residents, have filed numerous lawsuits against many Class Members in the District Court of Maryland for Montgomery County, Maryland, and have also taken liens on the property of numerous Class members in Montgomery County, Maryland.

### Continental's Business

17.    Continental marketed, originated, serviced, and collected on Plaintiff and Class members' credit card loan products, and extended credit to Plaintiff and Class members, all in exchange for compensation, but Continental has no license to do so under any law of any state.

18.    Continental is a small-loan lender. Credit limits on its accounts are all less than $6,000. Continental targets subprime customers and engages in predatory lending designed to lure borrowers with low credit ratings to enter into illegal loan agreements with onerous terms.

19.    Continental's business operations described in this Complaint violate both Missouri and Maryland law. Continental has an experienced compliance and legal department, which knows that Continental's credit business is in violation of Missouri and Maryland law. Continental has employed specific strategies to thwart enforcement of Missouri and Maryland law on its operations, including the sham "rent-a-bank" scheme described in this Complaint which Continental created and operates in order to broker and lend unlawfully.

### *Continental Advertises Its Credit Cards as Tools to Improve Credit Ratings*

20.     Continental targets its advertising to encourage consumer borrowers who are trying to rebuild their credit to obtain a Continental credit card in order to improve their credit credit records, histories, and ratings.

21.     Continental marketed its credit cards to Plaintiff and Class members using a variety of means, including direct mail, e-mail, marketing through affiliates, and the Internet.

22.     Continental advertises that "we understand how to help people improve their credit score by giving them an opportunity when other companies won't."

23.     Continental's marketing includes a blog called the "Continental Finance Blog" which advertises that it is providing advice on "HOW TO BUILD AND MAINTAIN GOOD CREDIT."

24.     Continental advertises that it is the "company mission to help cardholders everywhere rebuild and restore their credit."

25.     Continental advertises that it provides advice and assistance on "how to boost your credit score fast" including "how to increase credit score," "how quickly you can improve your credit score," "tips on how to raise credit score in 30 days" and "best ways to boost your credit score."

26.     Continental advertises that "If you have less than perfect credit, a CFC brand card can help you re-establish your credit history!"

27.     Continental advertises that "Continental Finance is one of the leading providers of credit cards for people with less-than-perfect credit. They can help you get closer to qualifying for a rewards card over time. This blog and other educational resources will help you qualify for a card and then use the card responsibly to help mend your credit."

28.    Continental advertises that "Continental Finance cards" provide "***Credit-building features***" and further advertises that:

> One of the best credit-building features that all Continental Finance cards provide is:
>
> Regular and frequent account reviews for credit limit increases. Simply make your first six required monthly minimum payments on-time and you'll be eligible for an automatic review for a credit limit increase.
>
> Beyond Credit Limit Increases, the card has more features to assist with building credit, including:
>
> Monthly reporting to the three major credit bureaus.
>
> There is also a $0 Fraud liability feature to help protect you from fraudulent charges and keep your credit history positive.
>
> The 24/7 online customer platform gives you custom alerts to help you keep up with payments, avoid late fees and ensure your credit building efforts stay on track.
>
> You'll also get free online access to your credit score each month by signing up for e-statements in the customer platform.

29.    Continental advertises that it offers access to credit to consumers across the United States.

30.    Continental advertises that it is a "financing solution" for consumers who do not meet the criteria for "prime" credit. It advertises that it is a "Leading Provider of Non-Prime Consumer Financial Solutions." It advertises that "[w]e specialize in servicing 'second-look financing' for consumers who are turned down by a prime lender, yet are just slightly below the prime threshold, and by servicing direct-to-consumer credit cards for consumers who are establishing or rebuilding their credit."

31.    Continental advertises that it "is the largest provider in the near-prime financial services space, having originated $6 Billion in assets to date and processing 12 Million

8

applications annually. Our Private Label Credit Card (PLCC) business has achieved over $2.6 Billion in originations and has experienced over 40% growth since 2018."

32.     Continental advertises that its services help consumers to "rebuild" credit. It advertises that its products give consumers the "opportunity to build and access credit."

33.     Continental advertises that "[w]e specialize in providing credit cards that help our customers build or establish credit with dignity and respect. If you have less than perfect credit, a CFC brand card can help you re-establish your credit history!"

34.     Continental advertises that "With our help, non-prime consumers can buy quality products and services without depleting their savings account."

35.     Continental advertises that it "provide[s] accounts to consumers when primary lenders cannot."

36.     Continental advertises that it "provid[es] non-prime consumers a second chance to access quality financing solutions and direct-to-consumer credit cards."

37.     Continental advertises that "[w]e pride ourselves on offering the same credit experience to non-prime customers that prime customers receive."

### *Continental Uses A Rent-A-Bank Scheme to Obtain Credit for Plaintiff and Class Members*

38.     After Continental lured Plaintiff and Class members with its advertising and marketing strategies, it utilized a rent-a-bank scheme to obtain extensions of credit for Plaintiff and each Class member.

39.     Continental developed a credit origination engine that, for Continental, ensures profits and eliminates risks. Drawing upon expertise in credit data analysis, mass marketing and debt collection, Continental built a specialized business model which enables it to prosper by purportedly "serving" – but in fact victimizing – poor and disadvantaged consumers.

40.     Continental's business is to extend small credit card loans with high fees and interest rates to borrowers with low credit ratings by using third-party financial institutions, with the promise to the borrowers that these loans will improve the borrowers' credit ratings. In fact, Continental's lending practices place these vulnerable consumers into more debt and aggravate the consumers' credit problems by increasing their indebtedness and imposing illegal lending terms.

41.     In order to conceal the unlawful nature of extensions of credit, Continental partnered with third-party banks, which are in some cases exempt from many state lending laws, as part of its rent-a-bank scheme.

42.     To effectuate this scheme, Continental agreed with the third-party banks in agreements including "Program Agreements," that Continental would market credit cards to, and solicit credit card applications from, consumers like Plaintiff and Class Members.

43.     Under the contracts between Continental and its third-party bank partners, including the Program Agreements, Continental is the true lender in the transactions of Plaintiff and Class members.

44.     For example, Continental agreed in advance with its third-party bank partners that Continental would perform the marketing for the credit card accounts of Plaintiff and Class members. Under Continental's agreements with its third-party bank partners, Continental marketed via direct mail, and through various modes of internet marketing. Continental prepared the product offerings and associated marketing materials, developed and placed electronic and print advertising, designed and developed websites, and delivered all notices and disclosures to Plaintiff and Class members. Continental alone was responsible for all costs and

expenses associated with advertising and developing promotional materials in connection with the loans to Plaintiff and Class members.

45.     Continental also agreed in advance with its third-party bank partners that Continental would provide the analytics, software, and underwriting models to underwrite the loans resulting from its marketing efforts, and that Continental would perform the underwriting for the credit card accounts resulting from its marketing efforts. Continental developed its own credit models for underwriting, based on data concerning prior Continental customers. As part of Continental's underwriting, it considered the risk of customers missing payments, the likelihood that a borrower would use a Continental credit card for a cash advance instead of a purchase, the borrower's history with other Continental credit cards, and other factors. Continental underwrote the loans of Plaintiff and Class members. Continental alone was responsible for all costs and expenses associated with underwriting the loans to Plaintiff and Class Members.

46.     Continental provided the loan application for Plaintiff and each Class member. Continental processed all loan applications from Plaintiff and each Class member to determine whether the Plaintiff and each Class member met eligibility criteria for the extension of credit, responded to all inquiries regarding the credit origination and application process, delivered all documents to Plaintiff and Class members in the course of the credit origination and application process, and maintained all documents pertaining to the loans to Plaintiff and each Class member.

47.     Continental, in Plaintiff and each Class member's transaction, also conducted credit risk assessment and loan underwriting.

48.     Continental determined that Plaintiff and each Class member satisfied the criteria required for an extension of credit and determined the amount of each extension of credit.

49.     Continental evaluated and approved the credit application for Plaintiff and each Class member.

50.     Continental determined the amount of credit to be extended to Plaintiff and each Class member.

51.     Continental approved and obtained the extension of credit to Plaintiff and each Class member.

52.     Continental drafted and provided the credit account agreements for Plaintiff and each Class member. Continental's form adhesion loan "agreement" documents included language stating that the terms of the agreement could be changed at any time, without any notice, and with retroactive effect.

53.     Although Continental is the true lender in the transactions of Plaintiff and Class Members, Continental does not issue the credit cards it advertises. Instead, Continental represented to Plaintiff and each Class member that the credit account would be issued, and credit initially extended, by a third-party bank. Those accounts were issued under Continental's oversight and Continental's contracts with its third-party financial institution partners, at Continental's request, in the amount requested by Continental. Each such agreement in the transactions of Plaintiff and MCSOL Class members elected to be governed by Missouri law.

54.     Under Continental's advance agreements with its third-party bank partners, Continental promptly after account issuance purchased the right to fund the credit and collect all payments on the credit card accounts it arranged for Plaintiff and each Class member.

55.     Continental promptly purchased Plaintiff's and each Class member's credit account receivables from its third-party bank partner, and thereafter extended all credit and collected all payments on Plaintiff's and Class members' accounts unless and until the accounts

were charged-off and sold to one of Continental's debt buyers. Continental directed Plaintiff and each Class member to make payments to Continental, not Continental's third-party bank partner.

56.     Continental arranged with its third-party bank partners, in advance of originating the credit accounts for Plaintiff and Class members, that Continental would advertise and market for the credit accounts, that it would handle all of the work necessary to originate the credit accounts, would service the credit accounts after origination, and that it would be entitled to collect and receive all payments made on the credit accounts, despite the fact that the credit accounts were issued by Continental's third-party bank partner.

57.     Continental managed all the operations relating to the submission of credit applications by Plaintiff and each Class member and the extension of credit to Plaintiff and each Class member, in exchange for a fee.

58.     Continental had agreed, in advance, to collect all payments, interest and fees due on the credit accounts of Plaintiff and each Class member.

59.     Continental charged amounts to Plaintiff and each Class member for obtaining extensions of credit for them. Continental charged and collected fees and interest from Plaintiff and each Class member. Continental, not its third-party bank partner, collected all sums – including fees – from Plaintiff and each Class member.

60.     Continental serviced and administered each loan to Plaintiff and each Class member. This servicing and administration included issuing statements, payment processing, collections customers service, refunds and adjustments, customer disputes, and other services.

61.     Continental undertook to recover and collect the maximum payment of interest and principal possible from Plaintiff and Class members, for its own benefit.

62.     Plaintiff and Class members made all payments on the credit accounts originated by Continental to Continental, unless and until their loans were "charged off" and sold at a discount to a debt-buyer debt collector like CKS.

63.     The only contact Plaintiff and Class members had with Continental's third-party bank partners in connection with their credit accounts through Continental was the bank partner's name on the credit agreement.

64.     In exchange for Continental's role in assisting Plaintiff and Class members to obtain credit accounts, Continental received, through its contracts with its third-party bank partners, the exclusive right to collect all payments of principal, interest and fees, from Plaintiff and each Class member. This arrangement rendered Continental the *de facto* lender; the true lender. Continental's reason for existence was to profit by purportedly providing advice and assistance to consumers, including Plaintiff and Class members, in obtaining loans nominally from a third-party financial institution, so that Continental would receive, in reciprocation, the legal right to receive payments from Plaintiff and Class members.

65.     This arrangement has been a lucrative business for Continental.

66.     Continental provided Plaintiff and each Class member with advice or assistance in the obtention of an extension of credit by others and was compensated for doing so by collecting money including fees directly from Plaintiff and each Class member.

67.     Not only did Continental broker the Plaintiff's and Class Members' extensions of credit without a license, Continental *de facto* brokered the loans to itself, deceptively disguising the loans as legitimate loans.

68.     Although the Plaintiff's and Class members' loans were purportedly initially issued by its third-party bank partner, Continental exerted control and ownership over those loans.

14

Continental carried out all interactions with the Plaintiff and each Class Member, accepted the ultimate credit risk, collected and pocketed the finance charges and fees, and owned and controlled the branding of the credit accounts, which were only available through Continental. Continental was in fact the primary lender, creditor and collector in connection with the loans that it made to Plaintiff and each Class member.

69.    Continental had the predominant economic interest in the loans it provided to Plaintiff and Class members.

70.    Continental formed its arrangement to have third-party financial institutions issue the credit cards it advertises and collects on as part of a specific effort to avoid laws regulating Continental.

71.    At all material times, Continental knew or acted with reckless disregard to the fact that it could not legally extend credit, because, as Continental knows and always knew, its arrangement of loans is in violation of the laws of many states – including Missouri's and Maryland's.

72.    Indeed, in connection with securitizations collateralized by Continental's credit card account receivables, Continental hired a bond rating agency which observed that the securities are risky because if a court finds that Continental is the "true lender" because of its arrangement to market and purchase credit card receivables from third-party financial institutions, the credit card receivables could be legally unenforceable; but also observed that the short life of the credit accounts and the quickly revolving nature of the credit accounts mitigated those risks.

73.     In other words, Continental knows that its loans are illegal, but perceives that it can get away with its illegal lending scheme because no one is likely to notice when Continental is extending small-dollar credit card loans to low income, credit-impaired consumers.

### *The Continental Entities Conspired to Conduct Illegal Activity*

74.     Continental's unlawful conduct described in this Complaint was the result of a conspiracy involving CFC and CP and other entities owned or operated by CFC, and third-party financial institutions.

75.     CFC and CP entered into multiple agreements under which the entities conspired, agreed, and aided and abetted the illegal conduct of the others.

76.     In committing the actions causing injuries and damages to Plaintiff and Class members, CFC and CP confederated with other persons, including each other, by agreement or understanding. CFC and CP's agreements and understandings with each other included agreements allocating responsibility among CFC and CP and third-party banks for each of the acts alleged in this Complaint – including but not limited to marketing for loan accounts, originating loan accounts, issuing credit cards, taking ownership of loan accounts, servicing loan accounts, and selling loan accounts.

77.     In furtherance of this conspiracy, CFC and CP each committed numerous unlawful acts, and used unlawful and tortious means to accomplish other acts.

78.     Among other things, and without limitation, CFC marketed for loan accounts which were represented to Plaintiff and Class Members as accounts with CFC, CFC originated unlawful loan accounts which were represented to Plaintiff and Class members to be accounts with CFC, and third-party financial institutions issued the credit cards on those accounts. CP purchased the credit card loan account receivables, CFC serviced the unlawful loan accounts it

originated, and collected money for itself and CP from Plaintiff and Class members. By undertaking these acts and others, CFC and CP provided substantial assistance, aid and encouragement to each other, and to the third-party financial institutions issuing the credit cards, in connection with the tortious actions alleged in this Complaint.

79.     For CP's part, among other things and without limitation, CP contracted with CFC and third-party banks that CFC would market credit card loan accounts to consumers including Plaintiff and Class Members, that the third-party banks would nominally issue the credit cards, and CFC, CP and third-party financial institutions agreed that the third-party banks would continually transfer on an ongoing basis, all of their rights, title, and interest in the account receivables to CP.

80.     As a result of the conspiracy, Plaintiff and Class Members sustained the actual legal damages alleged herein.

81.     CFC and CP each had actual knowledge of the wrongful conduct perpetrated by the others in their dealings with the Plaintiff and Class members, and of the role each played in furthering that conduct.

82.     In its dealings with Plaintiff and Class Members, CP was acting at all times relevant to the allegations contained in this Complaint as the agent of CFC.

83.     When perpetrating the acts alleged herein causing injury or damages to Plaintiff and Class members, CP and the employees and representatives and agents of CFC committed those acts within the scope of the employment or agency, and when performing services for which he or she or it had been engaged, and when acting in furtherance of CFC's interests.

84.     As a consequence, Plaintiff and the Class members have sustained the losses and damages described herein.

17

85.     Continental, including both CFC and CP, arranged their associations with third-party financial institutions in furtherance of a conspiracy to perpetrate their unlawful lending and credit services business scheme and to try to circumvent state consumer protection laws, like Missouri's and Maryland's.

### *Continental's Violations of Missouri Law Require It to Return All Payments It Collected from Plaintiff and Nationwide Class Members*

86.     Continental acted as a loan broker in the transactions of Plaintiff and Nationwide Class members, utilizing a rent-a-bank scheme to originate credit card accounts issued in the name of a Missouri-chartered bank.

87.     Although a bank issued the accounts for Plaintiff and Nationwide Class members, Continental had a pre-arrangement with the issuing bank that Continental does all the work to originate the accounts the bank is to issue, Continental tells the bank which accounts to issue, and Continental then collects and keeps all payments made under the accounts. These arrangements represent Continental's attempt to rent the bank's charter, so that Continental can purportedly extend loans that non-bank companies are not allowed to make under various state laws, including but not limited to the laws of Missouri and Maryland.

88.     But Continental is not exempt from state law. Continental is not a bank. Continental is an unlicensed, illegal loan broker reaping unlawful fees from consumers across the nation.

89.     Continental marketed credit card loans to Plaintiff and members of the MCSOL Class, by mail or otherwise, and encouraged and assisted them to obtain the credit card loans Continental marketed. Continental took the loan applications of Plaintiff and MCSOL Class members, underwrote them, approved them, and told Continental's bank partner to issue credit cards to Plaintiff and Nationwide Class members – all so that Continental could collect and keep

the payments made under the credit card agreements, including payments for interest and substantial fees that Continental was not legally authorized to collect.

90.     Continental, with respect to the extension of credit it arranged for the bank to extend to Plaintiff and MCSOL Class members, and in return for the payment of money or other valuable consideration by Plaintiff and MCSOL Class members, represented that it could and would obtain an extension of credit for Plaintiff and MCSOL Class members, and did so.

91.     To effectuate its scheme, Continental entered into credit card loan agreements with Plaintiff and MCSOL Class members which purport to allow Continental to collect payments and fees from Plaintiff and MCSOL Class members on the accounts it arranged. Continental elected in writing to apply Missouri law to its agreements with Plaintiff and MCSOL Class members. But the Missouri law Continental elected bans Continental's loan brokering practices.

92.     The MCSOL strictly regulates the activities of "credit service organizations" – which include loan brokers who represent they can obtain, and obtain, extensions of credit for consumers, like Continental. In the transactions of Plaintiff and each MCSOL Class member, Continental represented it could obtain, and did obtain, extensions of credit.

93.     Among other things, the MCSOL requires credit service organizations like Continental to include in each contract with consumers provisions allowing consumers to cancel the contracts within three days, detailing the services to be provided, and other information. The MCSOL also requires credit service organizations like Continental to get a surety bond and establish a surety account. The MCSOL forbids credit service organizations like Continental from even advertising services without filing a registration statement with the Missouri Director of Finance. Continental did not provide the cancellation provisions or information required

under the MCSOL to Plaintiff or Class members, and it has never filed the registration statement or gotten the surety bond the MCSOL requires. Nevertheless, Continental widely advertises and performs credit service organization services for Plaintiff and others, all while electing to be subject to Missouri law.

94.     Continental violated the MCSOL by failing to register as a credit services organization with the Missouri Director of Finance, failing to obtain a surety bond or establish a surety account, and failing to give Plaintiff and other MCSOL Class members required cancellation provisions, information, documents and disclosures. As a result of Continental's violations of the MCSOL, Plaintiff and the proposed MCSOL Class members have been damaged in an amount equal to all fees and charges they incurred in connection with Continental's arrangement of the loans with the Bank. Plaintiff and each MCSOL Class member was injured by Continental's violations because she or he paid for Continental's services without receiving the protections, documents, and disclosures that a credit services organization is statutorily required to provide to a buyer, under Missouri law.

95.     The MCSOL imposes strict penalties on credit service organizations which do not comply with it. The damages under the MCSOL "may not be less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and court costs." MCSOL § 407.644.

96.     Accordingly, Continental must return all payments made to it by Plaintiff and MCSOL Class members.

97.     Furthermore, as a result of the facts alleged in this Complaint, Plaintiff and each MCSOL Class member are entitled to a declaration that Continental is a credit service organization which must comply with the MCSOL and must provide the protections,

documents, and disclosures that a credit services organization is statutorily required to provide to a buyer, under Missouri law.

### *Continental's Violations of Maryland Law Mean that Assignee CKS Cannot Collect Plaintiff and CKS Class members' Void and Unenforceable Accounts*

98.     Maryland law also forbids Continental's loan-brokering business. Continental violated the Maryland analogue to the MCSOL – the MCSBA – rendering its credit agreements with Plaintiff and other CKS Class members void and uncollectible. And Continental's loans to Plaintiff and CKS Class members are also void and uncollectible under the MCLL.

99.     Continental regularly offers and extends consumer credit to Marylanders including Plaintiff and CKS Class members. Although Continental is domiciled outside of Maryland, the applications for the loans for the Maryland-resident Plaintiff and CKS Class members originated in Maryland and the credit cards associated with the loans were accepted and used in Maryland.

100.     Nevertheless, Continental attempted to evade Maryland law by arranging for a third-party financial institution to issue the credit cards for Plaintiff and CKS Class members, even though Continental marketed the loan accounts, underwrote the loan accounts, collected all payments on the loan accounts, and always bore all of the risk of the credit transactions – but Maryland's Legislature and Court of Appeals have seen through and prohibited such schemes.

101.     In particular, Maryland law requires persons like Continental to be licensed and to comply with the MCSBA and the MCLL. Continental does not have any license to conduct its credit services and lending business in Maryland and has never had any license to conduct its credit services and lending business (or any business) in Maryland.

*Continental Violated the MCSBA in CKS Class member Transactions*

102.     In *CashCall, Inc. v. Maryland Com'r of Fin. Regulation*, 448 Md. 412, 439 (2016)

("*CashCall*"), the Maryland Court of Appeals confirmed that the longstanding terms of the

MCSBA apply to persons utilizing a scheme like Continental's. *CashCall* addressed a lending

setup virtually identical to Continental's and explained why Maryland law required a loan broker

like Continental to be licensed. *CashCall* also held that a person arranging and then collecting on

loans, like Continental has done here, is the *de facto* lender in the transaction.

103.     The MCSBA regulates all "credit services businesses" who, like Continental, are

paid for arranging extensions of credit by others. *See* MCSBA § 14-1901; *see also CashCall*.

104.     Continental, including both CFC and CP, is a "credit services business" under the

MCSBA § 14-1901(e)(1)(ii). Continental, with respect to the extension of credit by third-party

financial institutions, sold, provided, performed, or represented that it could or would sell,

provide, or perform, the following services in return for the payment of money or other valuable

consideration: (i) improving a consumer's credit record, history, or rating or establishing a new

credit file or record, or providing advice or assistance to a consumer with regard to improving

the consumer's credit record, history, or rating or establishing a new credit file or record; and (ii)

obtaining an extension of credit for a consumer, or providing advice or assistance to a consumer

with regard to obtaining an extension of credit for the consumer. Continental's advertising about

its credit improvement and assistance services are detailed in this Complaint, as are Continental's

acts in obtaining extensions of credit for consumers from, or purportedly from, third-party

financial institutions.

105.     CFC and its wholly-owned subsidiary CP have a joint or common interest,

including a joint interest in the credit card accounts of Plaintiff and CKS Class members.

106.     In Plaintiff and CKS Class members' transactions, Continental, with respect to an extension of credit by a third-party financial institution, provided, performed, or represented that it could or would sell, provide, or perform, the service of obtaining an extension of credit for the consumer borrower.

107.     Continental offered or agreed to sell, provide, or perform services to Plaintiff and CKS Class members, who are all residents of this State. In addition, Continental makes written solicitations or communications that are received in Maryland, by Maryland residents like Plaintiff and CKS Class members. Accordingly, the MCSBA requires Continental, like all credit services businesses providing services to Marylanders, to be licensed. *See* MCSBA § 14-1903.

108.     Continental does not have the license prescribed by, and required by, the MCSBA.

109.     Continental violated numerous mandates of the MCSBA in its dealings with Plaintiff and CKS Class members.

110.     Continental received money or other valuable consideration from Plaintiff and CKS Class members when it had not secured a license from the Maryland Commissioner of Financial Regulation under Title 11, Subtitle 3 of the Financial Institutions Article, in violation of the MCSBA § 14-1902(1).

111.     Continental received money and valuable consideration solely for the referral of Plaintiff and CKS Class members to a credit grantor when the credit extended to the Plaintiff and Class Members was substantially on the same terms as those available to the general public, in violation of MCSBA §14-1902(2).

112.    Continental never provided to Plaintiff or any CKS Class member any of the disclosures required by the MCSBA §14-1906, and never provided Plaintiff or any CKS Class Member the "NOTICE OF CANCELLATION" required under that section.

113.    Moreover, Continental was not licensed as required by the MCSBA. Accordingly, it was prohibited from receiving any money or valuable consideration from Plaintiff or any CKS Class member under the MCSBA §14-1902(1).

114.    Furthermore, Continental's purported contracts for services with Plaintiff and each CKS Class member did not comply with the MCSBA. Accordingly, the purported contracts were void and unenforceable under the MCSBA § 14-1907(b), and Continental was never entitled to enforce any terms of any of those purported contracts or collect any money from Plaintiff or any CKS Class member in connection with those purported contracts.

115.    A credit services business license is subject to the licensing and investigatory provisions of the Maryland Installment Loans – Licensing Provisions, Md. Code Ann., Fin. Inst. §§ 11-301 *et seq*., which require a license before Continental could make any loans to Plaintiff or CKS Class members. Continental's lack of the required license means it never had the right to collect any money from Plaintiff or CKS Class members.

116.    In addition, a credit services business license is subject to the provisions of the Maryland Consumer Loans – Licensing Provisions, Md. Code Ann., Fin. Inst. §§ 11-201 *et seq*. For that reason, as well, Continental was never entitled to collect any money from Plaintiff or CKS Class members.

117.    Because Continental arranged loans for Plaintiff and CKS Class members without a license, under purported contracts with Plaintiff and CKS Class members which did not

contain the disclosures and terms required by the MCSBA, the contracts are void and

unenforceable as contrary to the public policy of Maryland. *See*, *e.g.*, MCSBA § 14-1907.

*Continental Violated the MCLL in CKS Class member Transactions*

118.    Each CKS Class member transaction involved a loan or advance of money or

credit of less than $25,000.00, subject to the MCLL.

119.    Continental made a loan to Plaintiff and each CKS Class member. Continental

did not perform its services in arranging loans with third-party financial institutions for free; it

was amply compensated for its loan operation. In exchange for Continental's role in assisting

Plaintiff and CKS Class members to obtain loans, Continental received, through contracts with

the third-party financial institutions, the exclusive right to collect all payments of principal,

interest and fees, including fees charged for preparing and processing the loans. Indeed,

Continental purchased the right from the third-party financial institutions to enforce the terms of

the loans to Plaintiff and CKS Class members, and to collect the payments that were to be made

by Plaintiff and CKS Class members under the terms of the loan, including all interest, penalties,

and fees. Indeed, if Plaintiff or CKS Class members mistakenly sent a loan payment to the third-

party financial institution, rather than to Continental, the third-party financial institution was,

pursuant to its contract with Continental, obligated to forward that payment to Continental.

120.    The third-party financial institutions never received any payments from Plaintiff

or CKS Class members, Continental did. Continental's *raison d'etre* was to profit by purportedly

providing advice and assistance to consumers in obtaining loans from the third-party financial

institutions it had partnered with so that it would receive, in reciprocation, the legal right to

receive payments from consumers like Plaintiff and CKS Class members. Plaintiff and CKS

Class members made direct payments on their loan accounts to Continental. Continental

deducted amounts from Plaintiff and CKS Class members' loans as "fees" which were to pay for the preparation and processing of their loans.

121.    Continental received, through contracts with the third-party financial institutions extending the credit to Plaintiff and CKS Class members, the exclusive right to collect all payments of principal, interest and fees from Plaintiff and CKS Class members, including origination fees which were assessed and which Continental collected before Plaintiff and CKS Class members used their credit cards. As a result, Continental was the *de facto* lender in Plaintiff and CKS Class members' transactions. *See CashCall*, 448 Md. at 436 (where a credit services business "received, through contracts with the banks, the exclusive right to collect all payments of principal, interest and fees, including the origination fee…[t]his arrangement, in essence, rendered CashCall [the credit services business] the *de facto* lender."). Continental extended credit to Plaintiff and each CKS Class member and made the loans to Plaintiff and each CKS Class member.

122.    Plaintiff and CKS Class members made numerous payments to Continental, including interest, costs, fees and other charges. Continental received and retained Plaintiff and CKS Class members' payments.

123.    Continental is in the business of making loans of less than $25,000.00. In fact, all of its loans to Plaintiff and CKS Class members are for less than $6,000.00. Continental makes numerous such loans to Marylanders each year.

124.    Continental does not have a license under the MCLL, as required under MCLL § 12-302.

125.    None of the loans of Plaintiff or CKS Class members contain a written election to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law

Article. None of the loans to Plaintiff or any other CKS Class members qualify for any of the limited exceptions to the application of the MCLL.

126.    Continental was not permitted to make its loans to Plaintiff or CKS Class members because it is not, and never has been, licensed under or exempt from the licensing requirements under the MCLL.

127.    Continental's loans to Plaintiff and each CKS Class member are void and unenforceable because Continental made the loans without a license under the MCLL, when Continental is not exempt from the licensing requirements of the MCLL.

128.    Continental has unlawfully received and retained, and continues to receive and retain, principal, interest, fees, and other compensation with respect to its loans to Plaintiff and CKS Class members, which are void and unenforceable under the MCLL.

129.    Continental is not, and has never been, licensed as required by Maryland law, the statutes requiring Continental to be licensed are regulatory in nature for the protection of the public, rather than merely to raise revenue, and Continental's actions described in this Complaint violate the fundamental public policy of Maryland.

130.    Continental never had any right to collect money from Plaintiff or Class Members, as a result of Continental's illegal, unlicensed activity.

131.    Continental has made many loans to Maryland residents, loans which are regulated by the MCLL, in each of the last three years and for many years prior to that. It is engaged in the business of making loans regulated by the MCLL.

132.    The MCLL prohibits making loans within its auspices without a license. *See* MCLL § 12-314(a) ("A person may not lend $25,000 or less if … [t]he person is not licensed

under or exempt from the licensing requirements under the Maryland Consumer Loan Law-- Licensing Provisions.").

133.    Because Continental made loans subject to the MCLL to Plaintiff and CKS Class members without a license, those loans are "void and unenforceable." *See* MCLL § 12-314(b) ("A loan made in the amount of $25,000 or less, regardless of whether the loan is or purports to be made under this subtitle, is void and unenforceable if…[a] person who is not licensed under or exempt from the licensing requirements under Title 11, Subtitle 2 of the Financial Institutions Article made the loan.").

134.    And Continental may not "receive or retain" any amounts from Plaintiff or CKS Class members in connection with its void and unenforceable loans to them. *See* MCLL § 12-314(b)(2) ("A person may not receive or retain any principal, interest, fees, or other compensation with respect to any loan that is void and unenforceable under this subsection.").

135.    After Continental brokered Plaintiff's and CKS Class members' loan accounts, it purchased them. However, Continental did not have the license required to purchase the loan accounts of Plaintiff and other CKS Class members. By doing so, Continental again violated the MCLL, and Continental's purchase of the loan accounts is another reason the accounts are unenforceable under Maryland law.

136.    Defendant CKS purchased the unenforceable Continental accounts of Plaintiff and other CKS Class members and is pursuing collection of those unenforceable accounts.

137.    Accordingly, Maryland law prohibits Continental – and CKS as Continental's assignee – from collecting any amounts on the Plaintiff and CKS Class members' loan accounts.

138.    Nevertheless, Continental unlawfully assigned Plaintiff and CKS Class members' accounts to CKS for CKS to collect.

*Plaintiff's Experiences*

139.    Plaintiff, Ms. Crider, received credit card marketing materials from Continental through the mail directed to her Maryland residence. As a result of those marketing materials, Plaintiff obtained a credit card account loan from Continental in the amount of less than $6,000.00, for consumer, family and household purposes, when Continental did not have a license to make such a loan under Maryland law and when Continental was not exempt from the licensing requirements of Maryland law. Ms. Crider accepted and used the credit card in Maryland and made payments on the credit card in Maryland.

140.    Ms. Crider obtained the credit card loan from Continental in Maryland in response to Continental's marketing efforts to her as a Maryland resident. Continental took Ms. Crider's loan application, underwrote it, decided to extend credit to her, and arranged for a credit card to be issued to and sent to her. Continental required Ms. Crider to make a payment of a fee to it before it extended any credit to her. Payment of the fee to Continental was a prerequisite for Plaintiff to obtain the loan Continental marketed to, and obtained for, Plaintiff. This fee was a processing fee and was paid to Continental for Continental's obtention of an extension of credit to Plaintiff. Plaintiff also paid other fees and payments to Continental for obtaining an extension of credit for her.

141.    Ms. Crider accepted her credit card, and then paid the initial processing fee Continental required before Continental allowed her to use the credit card.

142.    Ms. Crider's credit card was issued by one of Continental's third-party bank partners, but Continental – under a pre-existing agreement – promptly purchased and obtained the right to extend and collect all amounts under Ms. Crider's account.

143.    Continental collected all payments made by Ms. Crider on her account.

144.    Continental deducted amounts from Ms. Crider's loan as "fees," by charging them to her account, and demanding that she pay those fees. Ms. Crider paid Continental's fees, and Continental kept the payments.

145.    Continental's form adhesion documents for Ms. Crider's loan included provisions giving Continental the right to unilaterally change any of its agreements with her, at any time, without advance notice or an opportunity for her to reject any changes.

146.    Ms. Crider made numerous payments to Continental, including interest, costs, fees and other charges. Continental received and retained her payments. Ms. Crider never made any payment on the account to the third-party bank that issued the loan.

147.    On or about January 27, 2022, Continental sold all right, title and interest in Ms. Crider's loan account and agreement to CKS for a substantial discount on what Continental claimed was owed by Ms. Crider on the account.

148.    On December 27, 2022, CKS sued Ms. Crider in Maryland state District Court to collect the full purported account balance on her Continental-originated account.

### **Class Action Allegations**

149.    The Classes, as defined above, are identifiable.  The Plaintiff is a member of each Class. The Classes are each so numerous that joinder of all members is impracticable.

150.    There are questions of law and fact which are not only common to the members of the Classes but which predominate over any questions affecting only individual Class members.  The common and predominating questions include, but are not limited to:

**MCSOL Class**

A.    Whether Continental acted as a credit services organization under

the MCSOL in Plaintiff and MCSOL Class members'

transactions;

B.    Whether Continental failed to make any of the disclosures required

by the MCSOL to Plaintiff and MCSOL Class members;

C.    Whether Continental failed to include the cancellation options

MCSOL Class members;

D.    Whether Continental was required to register as a credit services

organization with the Missouri Director of Finance under the

MCSOL before engaging in transactions with Plaintiff and

MCSOL Class Members; and,

E.    Whether Continental must return all payments made to it by

Plaintiff and MCSOL Class members under the MCSOL.

**CKS Class**

F.    Whether Continental acted as a credit services business under the

MCSBA in CKS Class members' transactions;

G.    Whether Continental failed to make any of the disclosures required

by the MCSBA § 14-1906 in CKS Class members' transactions;

H.    Whether Continental was required to be licensed with the

Maryland Commissioner of Financial Regulation before engaging

in transactions with Plaintiff and CKS Class members;

I.    Whether Continental's transactions with each CKS Class Member

are contrary to the public policy of Maryland;

31

J.    Whether the statutes requiring Continental to be licensed are regulatory in nature for the protection of the public, rather than merely to raise revenue, and enforcing CKS Class Members' Continental loan accounts is against public policy;

K.    Whether Continental ever had any right to receive or retain any payments on CKS Class Members' loans;

L.    Whether each CKS Class Member is entitled to a declaration under the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. §§ 3-401 *et seq.* that their loan account is void and unenforceable; and

M.    Whether each CKS Class Member is entitled to recover all payments made to Continental under the MCLL.

151.    Plaintiff's claims are typical of the claims of the respective members of the Classes within the meaning of Md. Rule 2-231(b)(3) and are based on and arise out of similar facts constituting the wrongful conduct of Defendants.

152.    Plaintiff will fairly and adequately protect the interests of the Classes within the meaning of Md. Rule 2-231(b)(4).  Plaintiff is committed to vigorously litigating this matter. Further, Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

153.    Neither Plaintiff nor Plaintiff's counsel has any interests which might cause them not to vigorously pursue the claims in this Complaint.

154.     The prosecution of separate actions by individual members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants within the meaning of Md. Rule 2-231(c)(1)(A).

155.     Defendants' actions are generally applicable to each respective Class as a whole, and Plaintiff seeks equitable remedies with respect to the Classes within the meaning of Md. Rule 2-231(c)(2).

156.     Common questions of law and fact enumerated above predominate over questions affecting only individual members of the Classes and a class action is the superior method for fair and efficient adjudication of the controversy within the meaning of Md. Rule 2-231(c)(3).

157.     The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

158.     Plaintiff's counsel are experienced in class actions, and foresee little difficulty in the management of this case as a class action.

## Causes of Action

### COUNT I.          Violation of the MCSOL

### *(Against Continental Only)*

159.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

160.     Plaintiff and each MCSOL Class member was solicited to purchase and purchased the services of Continental.

161.     The agreements Continental had with Plaintiff and each MCSOL Class member each elect for Missouri law to apply to those agreements.

162.    Continental, in return for payment and valuable consideration, provided and represented that it could provide to Plaintiff and MCSOL Class members the service of obtaining an extension of credit for them, and could provide them advice and assistance with regard to doing so.

163.    Continental charged money and valuable consideration to Plaintiff and MCSOL Class members before completing performance of all services Continental agreed to perform for them.

164.    Continental advertised and cause to be advertised its services without filing a registration statement with the Missouri director of finance.

165.    Continental received money and other valuable consideration from Plaintiff and each MCSOL Class member, but never provided any of the MCSOL Class members a statement in writing, containing:

    a.    A complete and detailed description of the services to be performed by Continental for Plaintiff and MCSOL Class members and the total cost of the services;

    b.    A statement explaining the right of Plaintiff and each MCSOL Class member to proceed against the bond or surety account required by subdivision (1) of section 407.638 of the MCSOL;

    c.    The name and address of the surety company that issued the bond, or the name and address of the depository and the trustee, and the account number of the surety account;

    d.    A complete and accurate statement of the right of Plaintiff and each MCSOL Class member to review any file on the buyer maintained by a consumer

34

reporting agency, as provided by the federal Fair Credit Reporting Act, 15 U.S.C.

Section 1681, *et seq*.;

e.  A statement that the Plaintiff and each MCSOL Class member's file is available

for review at no charge on request made to the consumer reporting agency within

thirty days after the date of receipt of notice that credit has been denied, and that

the Plaintiff and each MCSOL Class member's file is available for a minimal

charge at any other time;

f.  A complete and accurate statement of the Plaintiff and each MCSOL Class

member's right to dispute directly with the consumer reporting agency the

completeness or accuracy of any item contained in a file on the Plaintiff and each

MCSOL Class member maintained by that consumer reporting agency;

g.  A statement that accurate information cannot be permanently removed from the

files of a consumer reporting agency;

h.  A complete and accurate statement of when consumer information becomes

obsolete and of when consumer reporting agencies are prevented from issuing

reports containing obsolete information; and

i.  A complete and accurate statement of the availability of nonprofit credit

counseling services.

166.   None of Continental's contracts with Plaintiff or MCSOL Class members

contained a statement as follows:

"YOU, THE BUYER, MAY CANCEL THIS CONTRACT AT ANY TIME BEFORE

MIDNIGHT OF THE THIRD DAY AFTER THE DATE OF THE

TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM

FOR AN EXPLANATION OF THIS RIGHT"

167.    None of Continental's contracts with Plaintiff or MCSOL Class members

identified the name and address of Continental's registered agent in any state authorized to

receive service of process.

168.    None of Continental's contracts with Plaintiff or MCSOL Class members

attached two easily detachable copies of a notice of cancellation. None of Continental's contracts

with Plaintiff or MCSOL Class members, or any associated documents, contained a notice in

boldfaced type and in the following form:

"NOTICE OF CANCELLATION

YOU MAY CANCEL THIS CONTRACT, WITHOUT ANY PENALTY OR

OBLIGATION, WITHIN THREE DAYS AFTER THE DATE THE CONTRACT

IS SIGNED. IF YOU CANCEL, ANY PAYMENT MADE BY YOU UNDER THIS

CONTRACT WILL BE RETURNED WITHIN TEN DAYS AFTER THE DATE OF

RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE. TO CANCEL

THIS CONTRACT, MAIL OR DELIVER A SIGNED DATED COPY OF THIS

CANCELLATION NOTICE, OR OTHER WRITTEN NOTICE TO:

(NAME OF SELLER) AT (ADDRESS OF SELLER) (PLACE OF BUSINESS) NOT

LATER THAN MIDNIGHT (DATE). I HEREBY CANCEL THIS TRANSACTION.

DATE: _____

BUYER'S SIGNATURE: _____"

169.    Continental's actions in its dealings with Plaintiff and each MCSOL Class

member violated the MCSOL §§ 407.635 to 407.644.

170.    Continental's violations of the MCSOL §§ 407.635 to 407.644 caused damages to Plaintiff and each MCSOL Class member.

171.    Continental obtained extensions of credit for Plaintiff and each MCSOL Class member in the form of credit card accounts which Continental marketed, encouraged Plaintiff and each MCSOL Class member to get. Continental then obtained the credit card account for Plaintiff and each MCSOL Class member, in return for the payment of money and valuable consideration. Plaintiff and each MCSOL Class member paid Continental for obtaining their extensions of credit by paying Continental the charges and fees Continental billed to and imposed upon them as part of their credit card accounts. Continental kept for its own benefit the charges and fees Continental billed to and imposed upon Plaintiff and MCSOL Class members as part of their credit card accounts.

172.    Furthermore, the bank issuing the credit card accounts obtained by Continental for Plaintiff and MCSOL Class members paid compensation to Continental in consideration of rights that Continental granted to the bank and services that Continental performed on behalf of the bank.

173.    Continental's violations of the MCSOL damaged Plaintiff and MCSOL Class members in an amount equal to all fees and charges they incurred in connection with Continental's credit card accounts.

174.    Plaintiff and each MCSOL Class member, directly or indirectly, paid Continental for obtaining extensions of credit for them.

175.    Plaintiff and each MCSOL Class member paid money to Continental for and because Continental obtained a credit card account for each of them. Continental provided to Plaintiff and each MCSOL Class member the service of obtaining an extension of credit for

them, Plaintiff and each MCSOL Class member paid for those services, and the Continental received payment for obtaining credit card accounts for Plaintiff and each MCSOL Class member.

### COUNT II.        Declaratory Relief under Md. Cts. & Jud. Pro. § 3-406
### *(Against All Defendants)*

176.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

177.    This claim for declaratory relief is brought under the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. § 3-406, to settle and obtain relief from uncertainty and insecurity with respect to the rights, status and legal relations of the Plaintiff and Class Members with Defendants, under the consumer protections embodied in Maryland law.

178.    Defendants maintain that Continental is not subject to the MCSOL, and that Continental did not violate the MCSOL as alleged in this Complaint.

179.    Plaintiff maintains that Continental is subject to the MCSOL, and that it did violate the MCSOL as alleged in this Complaint.

180.    Plaintiff maintains that she and MCSOL Class members are entitled to a declaration of their rights under the MCSOL and Continental's loan account agreements.

181.    Defendants maintain that Continental was not required to have a license from the Maryland Commissioner of Financial Regulation to engage in transactions with Plaintiff and CKS Class members.

182.    Plaintiff maintains that Continental was required to have a license from the Maryland Commissioner of Financial Regulation to engage in the transactions with Plaintiff and CKS Class members.

183.    Defendants maintain Continental did not violate the MCSBA in the transactions of Plaintiff and CKS Class members as alleged in this Complaint.

184.    Plaintiff maintains that Continental did violate the MCSBA in the transactions of Plaintiff and CKS Class members as alleged in this Complaint.

185.    Defendants maintain Continental did not violate the MCLL in the transactions of Plaintiff and CKS Class members as alleged in this Complaint.

186.    Plaintiff maintains that Continental violated the MCLL in the transactions of Plaintiff and CKS Class members.

187.    Plaintiff maintains that any purported contract between her and Continental, and between any CKS Class member and Continental, is void *ab initio* and unenforceable as contrary to the public policy of Maryland, under the MCSBA.

188.    Defendants maintain that purported contracts between Plaintiff and Continental, and between other CKS Class members and Continental, are not void *ab initio* and are not unenforceable as contrary to the public policy of Maryland under the MCSBA.

189.    Defendants maintain that Continental and CKS, as Continental's assignee, may assess and collect charges from Plaintiff and CKS Class members.

190.    Plaintiff maintains that Continental and CKS, as Continental's assignee, may not assess or collect charges from Plaintiff or CKS Class members because of Continental's legal violations alleged in this Complaint.

191.    Plaintiff maintains that Defendants do not have, and never had, the right to assess or collect charges from her, or from CKS Class members, and that the Defendants never had the right to assign any such rights to anyone else, due to the facts alleged in this Complaint.

192.    Plaintiff maintains that she and CKS Class members are entitled to a declaration of their rights under the MCSBA and the MCLL, and under the loan account contracts Continental assigned to CKS. Plaintiff maintains that she is entitled to a declaration that her loan account, and the loan accounts of CKS Class members, are void, unenforceable, and uncollectible.

193.    Plaintiff and members of both Classes have received or will receive collection notices from Defendants or their assignees demanding payment of the alleged amounts due and have been sued or will be sued for collection of the sums which Defendants or their assignees claim are due.  Moreover, Defendants notify credit reporting agencies of the alleged balances due, thereby damaging the credit scores and history of Plaintiff and Class Members.

194.    These practices continue and will continue unless and until this Court declares and affirms that Defendants do not have, and never had, the right to receive or retain money from Plaintiff and Class Members on their loan accounts.

195.    This presents an actual, justiciable controversy between the parties relating to the construction of the purported contracts of Plaintiff and Class Members and the application of the law to those purported contracts. Defendants have sought and will continue to seek to collect amounts from Plaintiff and Class Members when they are not legally entitled to do so. Defendants continue to harm Plaintiff and Class Members by doing so.

196.    Plaintiff and Class Members have a right to be free from the attempts of Defendants to collect amounts from them to which Defendants have no right.

**COUNT III.        Violation of the MCLL Licensing Provisions**

*(Against All Defendants)*

197.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

198.    Each of the loans to Plaintiff and CKS Class members which are the subject of this Complaint were for less than $25,000, are extensions of credit or loans subject to the MCLL and are "loans" under the MCLL.

199.    Continental, including CFC and CP, made the loans to Plaintiff and CKS Class members which are the subject of this Complaint, and thus is a "lender" under the MCLL.

200.    None of the loans to Plaintiff or CKS Class members elect to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of Title 12 of the Maryland Commercial Law Article.

201.    Continental made loans to Plaintiff and CKS Class members of less than $25,000 when Continental was required to be licensed under MCLL § 12-302, but Continental was not and never has been licensed under or exempt from the licensing requirements of the MCLL.

202.    The loans to Plaintiff and CKS Class members are and always were void and unenforceable under the MCLL.

203.    Continental was never entitled to receive or retain any principal, interest, fees, or other compensation with respect to any loan to Plaintiff or CKS Class members, under MCLL § 12-314.

204.    In violation of the MCLL, Continental, with respect to the Plaintiff's and CKS Class members' loans that are and always were void and unenforceable, collected and attempted to collect, directly or indirectly, amounts from Plaintiffs and CKS Class members.

205.    In violation of the MCLL, Continental and sold, assigned, or otherwise transferred the void and unenforceable loans of Plaintiff and Class Members to other persons.

WHEREFORE, Plaintiff demands declaratory judgment and judgment in an aggregated amount for the Class as a whole in excess of $75,000.00, as follows:

A.      A declaratory judgment establishing that Continental is subject to the MCSOL and did not comply with the MCSOL in the transactions of Plaintiff and MCSOL Class members;

B.      A declaratory judgment establishing that Continental was required to be licensed by the Commissioner of Financial Regulation to undertake the actions alleged in this Complaint;

C.      A declaratory judgment establishing that Continental never had any right to collect any money from Plaintiff or CKS Class members, that Plaintiff and CKS Class members' loans and agreements with Defendants are, and always were, void and unenforceable, and that CKS, as Continental's assignee, has no right to collect any money from Plaintiff or CKS Class members;

D.      The remedies provided by sections 407.635 to 407.644 of the MCSOL, including but not limited to not be less than the amount paid by Plaintiff and MCSOL Class members to Continental, plus reasonable attorney's fees and court costs, plus punitive damages;

E.      The relief prescribed under MCLL § 12-314, including a return to Plaintiff and CKS Class members of principal, interest, and other compensation received by Defendants on their accounts;

F.      Pre-judgment and post-judgment interest at the legal rate on all sums awarded to Plaintiff and members of both Classes; and,

G.       Such other and further relief as the nature of this case may require.

Respectfully submitted,

_____
Benjamin H. Carney (CPF No. 0412140132)
bcarney@GWCfirm.com
Richard S. Gordon (CPF No. 8912180227)
rgordon@GWCfirm.com
GORDON, WOLF & CARNEY, CHTD.
100 West Pennsylvania Ave., Suite 100
Towson, Maryland 21204
Telephone: (410) 825-2300
Facsimile: (410) 825-0066

Attorneys for Plaintiff and the Class

## JURY TRIAL

Plaintiff demands a trial by jury on all issues triable of right by a jury.

_____
Benjamin H. Carney